# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

WSOU INVESTMENTS LLC D/B/A §
BRAZOS LICENSING AND §
DEVELOPMENT, §
§
_Plaintiff_, §
§  C.A. No. 6:20-cv-00497-ADA
v. §
§
ZTE CORPORATION, §
§
_Defendant_. §
§
§

# ZTE CORPORATION'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY FOR LACK OF SUBJECT MATTER ELIGIBILITY UNDER 35 U.S.C. § 101

## <u>TABLE OF CONTENTS</u>

I.      WSOU HAS ASSERTED A PLAINLY ABSTRACT PATENT AGAINST ZTE ........... 1

II.     BACKGROUND: SUMMARY JUDGMENT ON § 101 IS APPROPRIATE
        BECAUSE THE '505 PATENT IS DIRECTED TO GATHERING,
        REFORMATTING, AND SENDING INFORMATION .................................................. 2

III.    LEGAL STANDARD: THE *ALICE* TWO-STEP FRAMEWORK FOR
        ANALYZING ABSTRACT IDEAS ...................................................................... 3

        A.    *Alice* Step One: Gathering, Reformatting, and Sending Information is
              Unpatentable ......................................................................................... 3

        B.    *Alice* Step Two: Implementing an Idea with Generic Computer
              Components Lacks "Inventive Concept" ............................................... 4

IV.     EVERY CLAIM OF THE '505 PATENT IS INVALID UNDER 35 U.S.C. § 101 ......... 5

        A.    *Alice* Step 1: The Independent Claims Of The '505 Patent Are Directed To
              The Abstract Idea Of Gathering, Reformatting, And Sending Information .......... 5

        B.    *Alice* Step 2: The Independent Claims of the '505 Patent do not Contain an
              Inventive Concept that Transforms the Abstract Idea into Patent-eligible
              Subject Matter ...................................................................................... 13

              1.    The independent claims' recitation of generic network and
                    computing components does not include an "inventive concept." ........... 13

              2.    All dependent claims also lack an "inventive concept." ........................... 16

V.      CONCLUSION ................................................................................................. 19

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adaptive Streaming Inc. v. Netflix, Inc.*,
   836 Fed.Appx. 900 (Fed. Cir. 2020) ............................................................................6, 7, 9

*Alice Corp. Pty. Ltd. v. CLS Bank International*,
   573 U.S. 208 (2014) .................................................................................................... *passim*

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018) ..........................................................................................3

*buySAFE, Inc. v. Google, Inc.*,
   765 F.3d 1350 (Fed. Cir. 2014) .................................................................................12, 14

*DDR Holdings, LLC v. Hotels.com, L.P.*,
   773 F.3d 1245 (Fed. Cir. 2014) ........................................................................................12

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
   758 F.3d 1344 (Fed. Cir. 2014) ..........................................................................................6

*Elec. Power Grp., LLC v. Alstom S.A.*,
   830 F.3d 1350 (Fed. Cir. 2016) .................................................................................. *passim*

*Encyclopaedia Britannica, Inc. v. Alpine Elecs. of Am., Inc.*,
   No. 05-CV-359-LY, 2008 WL 7328271 (W.D. Tex. Sept. 30, 2008) (Yeakel,
   J.), *aff'd sub nom. Encyclopaedia Britannica, Inc. v. Alpine Elec., Inc.*, 355 F.
   App'x 389 (Fed. Cir. 2009) ..................................................................................................3

*Enfish LLC v. Microsoft Corp.*,
   822 F.3d 1327 (Fed. Cir. 2016) .....................................................................................4, 9

*Genetic Techs. v. Merial LLC*,
   818 F.3d 1369 (Fed. Cir. 2016) ........................................................................................13

*Gottschalk v. Benson*,
   409 U.S. 63 (1972) ...............................................................................................................8

*iLife Techs., Inc. v. Nintendo of Am., Inc.*,
   839 Fed. App'x 534 (Fed. Cir. 2021) .................................................................................6

*Intell. Ventures I LLC v. Symantec Corp.*,
   838 F.3d 1307 (Fed. Cir. 2016) ........................................................................................13

*Internet Patents Corp. v. Active Network, Inc.*,
   790 F.3d 1343 (Fed. Cir. 2015) ..........................................................................................4

*Mayo Collaborative Servs. v. Prometheus Labs, Inc.*,
    566 U.S. 66 (2012) ...................................................................................................4, 5, 13

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
    837 F.3d 1299 (Fed. Cir. 2016) ..........................................................................................4, 9

*Messaging Gateway Sols., LLC v. Amdocs, Inc.*,
    2015 WL 1744343 (D. Del. Apr. 15, 2015) ...........................................................................16

*Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.*,
    811 F.3d 1314 (Fed. Cir. 2016) .............................................................................................8

*MyMail, Ltd. v. ooVoo, LLC*,
    2021 U.S. App. LEXIS 24764 (Fed. Cir. Aug. 19, 2021) .......................................................15

*MyMail, Ltd. v. ooVoo, LLC*,
    934 F.3d 1373 (Fed. Cir. 2019) .............................................................................................2

*Orbcomm Inc. v. Calamp Corp.*,
    215 F. Supp. 3d 499 (E.D. Va. 2016) ...................................................................................15

*PersonalWeb Techs. LLC v. Google LLC*,
    8 F.4th 1310 (Fed. Cir. 2021) ..........................................................................................9, 12

*Reese v. Sprint Nextel Corp.*,
    774 Fed. Appx. 656 (Fed. Cir. 2019) .............................................................................14, 15

*SAP Am., Inc. v. InvestPic, LLC*,
    898 F.3d 1161 (Fed. Cir. 2018) ....................................................................................4, 9, 17

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017) ......................................................................................6, 13

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014) ..............................................................................................5

**Federal Statutes**

35 U.S.C. § 101 ............................................................................................................ *passim*

**Rules**

Fed. R. Civ. P. 56(c) ........................................................................................................3

## I.     WSOU HAS ASSERTED A PLAINLY ABSTRACT PATENT AGAINST ZTE

U.S. Patent No. 7,203,505 (the "505 patent") is entitled "Message transfer from a source device via a mobile terminal device to a third device." Consistent with the title that describes "message transfer" from one device to another, the '505 patent claims the idea of reformatting information—one of the most rudimentary functions of a computer. *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016) (describing "storage and retrieval of data" as "basic functions" of computers). But the framework set out in *Alice Corp. Pty. Ltd. v. CLS Bank International* makes clear that abstract ideas that can be implemented on conventional computers—like reformatting information—are unpatentable under 35 U.S.C. § 101. 573 U.S. 208, 225 (2014). Accordingly, the ' 505 patent is invalid under § 101.

First, the claims are directed to the abstract idea of reformatting information. Exemplary claim 1 of the '505 patent generally describes "obtaining…data," "transmitting the data," "formatting the data," and "transmitting" a message. '505 patent, Claim 1. But the "obtaining," "formatting," and "transmitting" steps simply describe the unpatentable mental processes of reformatting information that any human can perform. Second, the '505 patent does not claim any "inventive concept" necessary to "transform the claimed abstract idea into a patent-eligible application" because the patent only claims generic network technology to implement the alleged invention. *See Alice*, 573 U.S. at 221 (internal citations omitted). In fact, the '505 patent itself admits that the data formatting protocols of the claimed methods can be performed within conventional and routine technology, explicitly touting that "the SMS protocol, SyncML protocol, WBXML, and MIME protocol" used in the invention are "***industrywide protocols***" that "are ***readily available***." '505 Patent, 4:46-51 (emphases added). The '505 patent further boasts that "[s]ince modern-day mobile terminals already include SMS capability and since SMS centers are already in place and operating, ***no new technology or equipment is needed*** to send SyncML

messages via the SMS network." *Id.*, 3:49-52 (emphases added). Therefore, because the '505 patent claims an unpatentable abstract idea and does not claim any "new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof," ZTE respectfully moves for summary judgment of invalidity under § 101.

## II.   BACKGROUND: SUMMARY JUDGMENT ON § 101 IS APPROPRIATE BECAUSE THE '505 PATENT IS DIRECTED TO GATHERING, REFORMATTING, AND SENDING INFORMATION

On June 3, 2020, WSOU Investments, LLC d/b/a Brazos Licensing and Development's ("WSOU") sued ZTE Corporation ("ZTE") for alleged infringement of claims 1-48 of the '505 patent. Dkt. No. 1. Claim construction briefing is complete and a Claim Construction Order issued on March 3, 2022. Dkt. No. 164. Discovery is scheduled to close on November 1, 2022, and trial will be set on October 11, 2023 (as proposed by the parties).[1] Accordingly, the Court has the "full understanding of the basic character of the claimed subject matter" necessary for determining patent eligibility. *See MyMail, Ltd. v. ooVoo, LLC*, 934 F.3d 1373, 1379 (Fed. Cir. 2019) (citations omitted).

While claim 1 is exemplary, the '505 patent includes five independent claims–1, 14, 23, 36, and 41–which respectively describe methods and devices for "data synchronization" that is performed by "terminal device[s]" in a "network." '505 Patent, 4:55-8:24. Not a single independent or dependent claim is patent eligible because they all claim reformatting information using conventional computing devices, such as a "terminal device" and a "network." Indeed, the '505 patent itself indicates that the data formatting protocols of the claimed methods can be performed within conventional and routine technology, explicitly touting that "the SMS protocol, SyncML protocol, WBXML, and MIME protocol" used in the invention are "***industrywide***

---

[1] The Amended Scheduling Order sets out three dates, including October 11, 2023, for the three consolidated trials, but the date of this specific case has not yet been established. Dkt. No. 227.

**protocols**" that "are **readily available**." *Id.*, 4:46-51 (emphases added). The '505 patent further

boasts that "[s]ince modern-day mobile terminals already include SMS capability and since SMS

centers are already in place and operating, **no new technology or equipment is needed** to send

SyncML messages via the SMS network." *Id.*, 3:49-52 (emphases added).

## III.   LEGAL STANDARD: THE *ALICE* TWO-STEP FRAMEWORK FOR ANALYZING ABSTRACT IDEAS

Summary judgment should be granted if the record, taken as a whole, "together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." *Encyclopaedia Britannica, Inc. v. Alpine Elecs.

of Am., Inc.*, No. 05-CV-359-LY, 2008 WL 7328271, *3 (W.D. Tex. Sept. 30, 2008) (Yeakel, J.),

*aff'd sub nom. Encyclopaedia Britannica, Inc. v. Alpine Elec., Inc.*, 355 F. App'x 389 (Fed. Cir.

2009) (citing Fed. R. Civ. P. 56(c)). "[W]hether a claim recites patent eligible subject matter is a

question      of      law      which      may      contain      underlying      facts."

*Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). Accordingly, "[w]hen there is no

genuine issue of material fact regarding whether the claim element or claimed combination is well-

understood, routine, conventional to a skilled artisan in the relevant field, this issue can be decided

on summary judgment as a matter of law." *Id.*

Under 35 U.S.C. § 101, "[w]hoever invents or discovers any new and useful process,

machine, manufacture, or composition of matter, or any new and useful improvement thereof, may

obtain a patent thereof." Patents may not be obtained for " laws of nature, natural phenomena, [or]

abstract ideas." *Alice,* 573 U.S. at 217. In *Alice,* the Supreme Court established a two-step test that

district courts must apply in a patent eligibility analysis under § 101.

### A.   *Alice* Step One: Gathering, Reformatting, and Sending Information is Unpatentable

First, at step one, a court must "determine whether the claims at issue are directed to one

of those patent-ineligible concepts." *Alice*, 573 U.S. at 217 (citing *Mayo Collaborative Servs. v. Prometheus Labs, Inc.*, 566 U.S. 66, 77 (2012)). Courts "look to whether the claims . . . focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016).

At step one, courts review the claims "in light of the specification, based on whether 'their character as a whole is directed to excluded subject matter.'" *Enfish LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016) (quoting *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015)). Because "[s]oftware can make non-abstract improvements to computer technology," it is "relevant to ask whether [computer-related] claims are directed to an improvement to computer functionality versus being directed to an abstract idea." *Id.*

However, "claims focused on 'collecting information, analyzing it, and displaying certain results of the collection and analysis' are directed to an abstract idea." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018) (citing *Elec. Power Grp.*, 830 F.3d at 1353 (Fed. Cir. 2016)). "Information as such is an intangible, hence abstract, and collecting information, including when limited to particular content (which does not change its character as information), is within the realm of abstract ideas. So, too, is analyzing information by mathematical algorithms, without more. And merely presenting the results of abstract processes of collecting and analyzing information, without more (such as identifying a particular tool for presentation), is abstract as an ancillary part of such collection and analysis." *Id.* (citations and internal quotation marks omitted).

### B.   *Alice* Step Two: Implementing an Idea with Generic Computer Components Lacks "Inventive Concept"

If the court concludes under step one that the claim is directed to a patent-ineligible concept, at *Alice* step two, the court must then examine what else there is in the claim. *Alice*, 573

U.S. at 217 (citing *Mayo*, 566 U.S. at 76–77). Step two involves a "search for an 'inventive concept'—i.e., an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* at 217–18 (citing *Mayo*, 566 U.S. at 72).

In considering what else there is in the claim, courts must "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (citing *Mayo*, 566 U.S. at 78–79). This inquiry determines whether claims reciting an abstract idea "do significantly more than simply describe that abstract method" and instead "'transform' the claimed abstract idea into patent-eligible subject matter" with "additional features." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014). "Those 'additional features' must be more than 'well-understood, routine, conventional activity.'" *Id.* (citing *Mayo*, 566 U.S. at 79-80), *see also Alice*, 573 U.S. at 224-5 (explaining that claim steps requiring "electronic recordkeeping" and "use of a computer to obtain data, adjust account balances, and issue automated instructions" do "no more than require a generic computer to perform generic computer functions")). Claims that "merely require generic computer implementation, fail to transform that abstract idea into a patent-eligible invention." *Alice*, 573 U.S. 208, 209 (2014) (discussing method claims at issue).

## IV.   EVERY CLAIM OF THE '505 PATENT IS INVALID UNDER 35 U.S.C. § 101

### A.   *Alice* Step 1: The Independent Claims Of The '505 Patent Are Directed To The Abstract Idea Of Gathering, Reformatting, And Sending Information

Claim 1 of the '505 patent generally claims four steps for "data synchronization" between two devices: (1) obtaining data; (2) transmitting the data; (3) formatting the data; and (4) transmitting the formatted data. These steps, as shown in the emphasized claim language below, describe the abstract idea of gathering, reformatting, and sending information:

> ***A method*** *for data synchronization between a first terminal device and a second, remotely located, terminal device via an intermediate terminal device, the method comprising:*
>
> ***obtaining***, *at the first terminal device,* ***data to be synchronized with the second remotely located terminal device;***
>
> ***transmitting the data*** *from the first terminal device to the intermediate terminal device through a short-range connection;*
>
> ***formatting the data to be synchronized into at least one SMS (Short Message Service) message*** *in the intermediate terminal device; and*
>
> ***transmitting the at least one SMS message*** *from the intermediate terminal device to the second remote located terminal device through cellular network connection.*

Accordingly, claim 1 merely discloses "collecting information" by transmitting it between terminal devices, "formatting" it, and "transmitting" a "message" about that information—there is not even any analysis of information in the claim. *See Elec. Power Grp.*, 830 F.3d at 1353 (describing the abstract idea of "collecting information, analyzing it, and displaying certain results of the collection and analysis"). However, obtaining, manipulating, and distributing information is fundamentally abstract. *See Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.,* 758 F.3d 1344, 1350 (Fed. Cir. 2014) (holding that claims directed to generating first and second data by taking existing information, manipulating the data using mathematical functions, and organizing this information into a new form were directed to an abstract idea because they described a process of organizing information through mathematical correlations). And courts have repeatedly held that gathering, reformatting, and sending information amounts to an abstract idea. *See, e.g., iLife Techs., Inc. v. Nintendo of Am., Inc.*, 839 Fed. App'x 534, 536-7 (Fed. Cir. 2021) ("We have routinely held that claims directed to gathering and processing data are directed to an abstract idea."); *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017) (claims focused on sending and monitoring information are directed to an abstract idea); *Adaptive Streaming Inc. v. Netflix, Inc.*, 836 Fed.Appx. 900, 903 (Fed. Cir. 2020) (nonprecedential) (holding that claims directed to format conversion from an incoming signal's format to a variety

of formats suited to different destination devices were directed to an abstract idea).

In describing a method for "data synchronization," claim 1 evokes the ineligible claims in *Adaptive Streaming*, which were directed towards to determining a "compression format more suitable for the at least one client device." *See* 836 Fed.Appx. at 901-02. Like the similar claims in *Adaptive Streaming*, "the focus of the claimed advance is the abstract idea of format conversion, from an incoming signal's format to a variety of formats suited to different destination devices," and "not any specific advance in coding or other techniques for implementing that idea; no such specific technique is required." *See id.* at 903. Thus, claim 1, like the abstract "format conversion" claims of *Adaptive Streaming*, is abstract. *See id.* The parallel contents of claim 1 of the '505 patent here and unpatentable claim 39 from *Adaptive Streaming* are depicted below:

| Claim 1 | *Adaptive Streaming*, Claim 39 |
|---|---|
| A method for data synchronization between a first terminal device and a second, remotely located, terminal device via an intermediate terminal device, the method comprising: | A system to broadcast to at least one client device, the system comprising: |
| *obtaining*, at the first terminal device, *data to be synchronized* with the second remotely located terminal device; | an *image retrieval portion to retrieve* at least one incoming video signal having a first format; |
| transmitting the data from the first terminal device to the intermediate terminal device through a short-range connection; | |
| *formatting the data to be synchronized* into at least one SMS (Short Message Service) message in the intermediate terminal device; and | a data structure usable to determine parameters for second compression formats for the at least one incoming video signal; and at least one *transcoding module* coupled to the image retrieval portion and which has access to the data structure, *the transcoding module being capable to transcode* the at least one incoming video signal from the first format into multiple compressed output video signals having respective second compression formats based at least in part on the parameters; |
| *transmitting* the at least one SMS *message from the intermediate terminal device to the second remote located terminal device* through cellular network connection. | wherein at least one of the second compression formats is more suitable for the at least one client device than the first format; and wherein the *multiple compressed output video signals* having the at least one second compression format more suitable for the at least one client device *can be provided by the* |

7

|  | ***broadcasting server***, wherein any one of the multiple compressed output video signals can be selected to be presented at the at least one client device. |
|--|--|

Neither the preamble's recitation of "a first terminal device," "a second, remotely located, terminal device," and "an intermediate terminal device," nor the claimed "cellular network connection" changes that claim 1 is directed to an abstract idea. As the patent itself indicates, a "[d]ata synchronization between terminal devices" is a known technique in the field. Ex. A, Declaration of Stephen Gray, ¶¶ 33-36; '505 Patent, 1:14-18. Moreover, the '505 patent indicates that the data formatting protocols of the claimed methods can be performed within conventional and routine technology because "the SMS protocol, SyncML protocol, WBXML, and MIME protocol" used in the invention are "***industrywide protocols***" that "are ***readily available***." '505 Patent, 4:46-51 (emphases added). Indeed, the specification admits that "[s]ince modern-day mobile terminals already include SMS capability and since SMS centers are already in place and operating, ***no new technology or equipment is needed*** to send SyncML messages via the SMS network." *Id.*, 3:49-52 (emphases added).

Addressing a similar concept in *Gottschalk v. Benson,* the Court reasoned that an algorithm for converting binary coded decimal to pure binary within a computer's shift register was abstract as it could be performed purely mentally and the claimed procedures "can be carried out in existing computers long in use, no new machinery being necessary." 409 U.S. 63, 67 (1972). *See also Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.,* 811 F.3d 1314, 1324 (Fed. Cir. 2016) (concluding that concept of "anonymous loan shopping" recited in a computer system claim is an abstract idea because it could be "performed by humans without a computer"). Likewise, existing network devices perform the steps described in claim 1 and the claimed "network" and "terminal devices" do not require or include any specialized computer equipment. *See McRO*, 837 F.3d at

1314. Nor is claim 1 directed to a non-abstract improvement to computing functionality, such as a new or improved computer, network, processor, or the like. *See Enfish*, 822 F.3d at 1335; *SAP*, 898 F.3d at 1168. Indeed, as detailed above, the '505 patent boasts that the data formatting protocols of the claimed methods can be performed within conventional and routine technology, and that no new technology is requires. *See* '505 Patent, 4:46-51; 3:49-52.

Unsurprisingly, and as the following table shows, each of the steps of claim 1 could be performed by a human being mentally or with a pencil and paper, a "telltale sign of abstraction." *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1316 (Fed. Cir. 2021). Indeed, as in *Adaptive Streaming*, the focus of claim 1 is merely determining a "compression format more suitable for the at least one client device." *See* 836 Fed.Appx. at 901. The specification is explicit that no special structure, hardware, or software beyond generic network technology need be used for detecting congestion and sending congestion messages. '505 Patent, 3:49-52, 4:46-51. And consistent with the disclosure in the specification, not a *single* limitation of the claims requires any specialized or non-generic computing equipment. Thus, the claims are directed towards an unpatentable abstract idea.

For example, all of the elements of independent claim 1 can be conceptualized in the human mind and performed by a human using conventional computing hardware and software, as depicted below:

| Abstract claim language | Corresponding mental process |
|---|---|
| A method for data synchronization between a first terminal device and a second, remotely located, terminal device | A person wants to convert some data into a message. |

| | |
|---|---|
| via an intermediate terminal device, the method comprising: |  |
| obtaining, at the first terminal device, data to be synchronized with the second remotely located terminal device; | The person looks at data on a computer. |
| transmitting the data from the first terminal device to the intermediate terminal device through a short-range connection; | The person send the data from the computer to a second person's phone. |

| | |
|---|---|
| formatting the data to be synchronized into at least one SMS (Short Message Service) message in the intermediate terminal device; and | The second person converts the data to a message on her phone. |
| transmitting the at least one SMS message from the intermediate terminal device to the second remote located terminal device through cellular network connection. | The second person send the message to a third person's phone. |



The other independent claims are likewise directed to the same abstract idea of gathering, reformatting, and sending information, do not require any specialized computer software or hardware, and can be performed by a human using conventional equipment:

- Independent claim 14 recites nearly identical steps of data transmission and formatting message. Claim 14 merely adds a "mobile terminal device" comprising a "data message receiver," a "formatter," and a "transmitter" to perform the data gathering, reformatting, and sending steps.

- Independent claim 23 recites identical steps of "obtaining," "transmitting," "formatting," and "transmitting." Claim 14 merely adds a "program storage device" containing "a program of instructions" to perform the data gathering, reformatting, and sending steps.

11

- Independent claim 36 recites identical steps of "obtaining," "transmitting," "formatting," and "transmitting." Claim 36 merely adds another "transmitting" step.

- Independent claim 41 recites identical steps of "obtaining," "transmitting," "formatting," and "transmitting." Claim 41 merely adds another "transmitting" step and a "program storage device" containing "a program of instructions" to perform the data gathering, reformatting, and sending steps.

Neither adding another data transmission step (claims 36 and 41) nor adding generic computer or network components (claims 14, 23, and 41) take the claims outside the realm of unpatentable abstract ideas. For example, elements such as terminal devices, receivers, formatters, transmitters, and program storage devices are merely generic network and computing components configured to carry out conventional methods of gathering, reformatting, and sending data. Ex. A, ¶¶ 33-36. Moreover, "not all transformations or machine implementations infuse an otherwise ineligible claim with an inventive concept." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014) (internal citations omitted). In *PersonalWeb*, the Federal Circuit held that using generic technology such as a "hash function, a server system, or a computer" failed to render the claims non-abstract because "merely adding computer functionality to increase the speed or efficiency of the process does not confer patent eligibility on an otherwise abstract idea." 8 F.4th at 1319. Components of a network such as terminal devices, receivers, formatters, transmitters, and program storage devices are routinely and conventionally used to perform the functions of gathering, reformatting, and sending information. Ex. A, ¶¶ 33-36. Thus, merely adding such elements to carry out abstract steps of gathering, reformatting, and sending information does not confer patent eligibility on the abstract steps. *See, e.g., Elec. Power Grp.*, 830 F.3d at 1355 ("We have repeatedly held that such invocations of computers and networks that are not even arguably inventive are 'insufficient to pass the test of an inventive concept in the application' of an abstract idea.") (quoting *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1353 (Fed. Cir. 2014)). Therefore,

claims 14, 23, 36, and 41 are abstract and do not add anything significantly more than the abstract idea of gathering, reformatting, and sending information.

> **B.**   ***Alice* Step 2: The Independent Claims of the '505 Patent do not Contain an Inventive Concept that Transforms the Abstract Idea into Patent-eligible Subject Matter**

Step two of the *Alice* framework dictates that a patent directed towards an abstract idea is ineligible and therefore invalid if it lacks an "inventive concept"—i.e., something that ensures the patent "amounts to significantly more than" the ineligible concept itself. *Alice*, 573 U.S. at 217–18 (citing *Mayo*, 566 U.S. at 72). Importantly, an inventive concept "cannot be furnished by the unpatentable law of nature (or natural phenomenon or abstract idea) itself." *Genetic Techs. v. Merial LLC,* 818 F.3d 1369, 1376 (Fed. Cir. 2016).

> **1.**   **The independent claims' recitation of generic network and computing components does not include an "inventive concept."**

Independent claims 1, 14, 23, 36, and 41 do not contain "significantly more" beyond the abstract idea of gathering and sending information. Instead, claims 1, 14, 23, 36, and 41 merely recite "generic functional language to achieve the[] purported solutions." *See Two-Way Media*, 874 F.3d at 1339. The claims only include broad recitations of using routine and conventional computing functionality to "receive," "format," and "transmit" information. Indeed, like the claims in *Electric Power Group*, "[n]othing in the claims, understood in light of the specification, requires anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information." 830 F.3d at 1355; *see also Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1316 (Fed. Cir. 2016) (finding claims invalid at step two of *Alice* inquiry for lack of "specific or limiting recitation of . . . improved computer technology.") (citation omitted). Ex. A, ¶¶ 33-36. The '505 patent itself indicates that the data formatting protocols of the claimed methods can be performed within conventional and routine

technology, explicitly touting that "the SMS protocol, SyncML protocol, WBXML, and MIME protocol" used in the invention are "***industrywide protocols***" that "are ***readily available***." '505 Patent, 4:46-51 (emphases added).  The '505 patent further boasts that "[s]ince modern-day mobile terminals already include SMS capability and since SMS centers are already in place and operating, ***no new technology or equipment is needed*** to send SyncML messages via the SMS network." *Id.*, 3:49-52 (emphases added). Accordingly, the search for "something more" than the abstract idea of gathering and sending information in claims 1, 14, 23, 36, and 41 is limited to the only potentially non-abstract elements—the "terminal device[s]," "cellular network connection," "data message receiver," "formatter," "transmitter," and "program storage device."

The "terminal device[s]" communicating with a "cellular network connection" does not impart "significantly more" than the abstract idea—the '505 patent merely claims a generic communication network that performs the routine and conventional functions of "obtaining," "formatting," and "transmitting" information. Ex. A, ¶¶ 33-36. Indeed, the Federal Circuit confirmed in *buySAFE* that "receiv[ing] and send[ing] the information over a network" is generic. 765 F.3d at 1355. The Federal Circuit has also explained that, like how "reciting the use of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention," "steps that generically recite the use of a telephone network cannot confer patent eligibility." *Reese v. Sprint Nextel Corp.*, 774 Fed. Appx. 656, 661 (Fed. Cir. 2019) (affirming a summary judgment that claims directed to an apparatus and method of providing call waiting and caller ID service through the central office of a telephone service provider were invalid under § 101). Similarly here, the "obtaining," "formatting," and "transmitting" steps are performed by generic "terminal device[s]" requiring no specialized hardware or software, and thus the claimed "terminal device[s]" and "cellular network connection"  cannot confer patent eligibility.

Similarly, the claimed "data message receiver," "formatter," and "transmitter" in claim 14 and "program storage device" in claims 23 and 41 are also merely generic computer components that do not require any specialized functionality. '505 Patent, 3:49-52 ("[s]ince modern-day mobile terminals already include SMS capability and since SMS centers are already in place and operating, ***no new technology or equipment is needed*** to send SyncML messages via the SMS network."), *see also* Ex. A, ¶¶ 33-36. Accordingly, like the claims in *Reese*, nothing in the independent claims of the '505 patent "requires anything other than conventional [] network equipment to perform the generic functions of receiving and sending information" and, thus, none of claims 1, 14, 23, 36, and 41 contain an inventive concept. *See* 774 Fed. Appx. at 661. Additionally, "[e]ven when viewing the claim elements as an ordered combination," there is no inventive concept in in claims 1, 14, 23, 36, and 41 because the elements merely describe the abstract steps of "obtaining," "formatting", and "transmitting" information in logical order. *See MyMail, Ltd. v. ooVoo, LLC,* 2021 U.S. App. LEXIS 24764, *17-18 (Fed. Cir. Aug. 19, 2021) ("[e]ven when viewing the claim elements as an ordered combination, we discern no inventive concept in the process of sending information from a user device to a server, determining at the server whether the user device should receive toolbar update data, receiving at the user device the update data, updating the toolbar, and displaying the toolbar.").

Additionally, the claimed invention does not overcome a problem specifically arising in the field of terminal devices or networks. Instead, "[t]he issue of incompatibility in communication has existed as long as language itself. Translation has always been the solution. . . . ***Reformatting information*** does not solve a problem arising in the realm of computer networks and ***is not an inventive concept***." *Orbcomm Inc. v. Calamp Corp.*, 215 F. Supp. 3d 499, 507 (E.D. Va. 2016) (emphasis added).

15

Finally, the claims here are nothing like the patent-eligible claims in *Messaging Gateway Solutions, LLC v. Amdocs, Inc.*, 2015 WL 1744343 (D. Del. Apr. 15, 2015). For example, the claims in *Messaging Gateway* "use[] technology that allows communication where it would otherwise be impossible." *Id.* at *5. By contrast, the '505 patent simply uses conventional equipment to facilitate the admittedly known technique of "[d]ata synchronization between terminal devices." Ex. A, ¶¶ 33-36; '505 Patent, 1:14-18. Indeed, unlike the *Messaging Gateway* claims which "specif[y] how an interaction between a mobile phone and a computer is manipulated in order to achieve a desired result which overrides conventional practice" (2015 WL 1744343 at *5), the '505 patent emphasizes that its claimed methods can be performed within conventional and routine technology, using "readily available" "industrywide protocols." '505 Patent, 4:46-51. Far from overriding conventional practice, the '505 patent further boasts that its methods need "***no new technology or equipment* . . . .**" *Id.*, 3:49-52 (emphases added). Additionally, unlike the claims in *Messaging Gateway*, the claims here lack  "meaningful limitations that prevent [them] from preempting the abstract idea of receiving, translating, and delivering a message." 2015 WL 1744343 at *5. Here, the claims are only nominally tied to the claimed steps of "obtaining," "transmitting," and "formatting," since they include no meaningful limitations of how each structure actually effects these results.

## 2.     All dependent claims also lack an "inventive concept."

The dependent claims similarly add nothing "significantly more" than the abstract idea recited in the independent claims.

The limitations of claims 2-13, 15-22, 24-35, 37-40, and 42-45 do not elevate the claims to significantly more than the abstract idea of gathering, reformatting, and sending information. As shown below, these claims are directed to similar steps of reformatting and sending information, with nothing beyond this abstract idea because narrow mathematical operations "add nothing

outside of the abstract realm." *See SAP*, 898 F.3d at 1169.

| Claims directed to the abstract idea of gathering, reformatting, and sending information. | | | | |
|---|---|---|---|---|
| Dependent Claim | Element | Physical structure or specialized hardware or software required | Applicable law | "Something more" than abstract idea? |
| 2, 15, 24 | "formatting the data message comprises formatting the data in a SyncML format" via "the formatter." | No. | *See SAP*, 898 F.3d at 1169. | No. |
| 8, 18, 30 | "the data formatted in a SyncML format comprises one of two MIME (Multipurpose Internet Mail Extensions) formats." | No. | Same. | No. |
| 9, 19, 31 | "the two MIME formats comprise vcal and vcard formats." | No. | Same. | No. |
| 3, 25 | "the intermediate terminal device comprises a mobile terminal device." | No. | *Elec. Power Grp.*, 830 F.3d at 1354. | No. |
| 4, 26, 37, 42 | "the at least one SMS message is transmitted via a mobile network including an SMS message center." | No. | Same. | No. |
| 5, 27 | "the at least one SMS message is transmitted from the intermediate terminal device to the second, remotely located, terminal device via the mobile network and a gateway and the Internet." | No. | Same. | No. |
| 11, 33, 38, 43 | "the data message is transferred from the first terminal device to the intermediate terminal device via a short range communication link." | No. | Same. | No. |
| 12, 21, 34, 39, 44 | "the short range communication link comprises one of an IR (Infrared) or Bluetooth communication link." | No. | Same. | No. |
| 13, 22, 35, 40, 45 | "transmitting at least one other SMS message from the second terminal device to the first terminal device via the intermediate terminal device" via "a receiver to receive at | No. | Same. | No. |

| | | | | |
|---|---|---|---|---|
| | least one other SMS message from the another terminal device and a data message transmitter to transmit the at least one other SMS message to the first terminal device" | | | |
| 6, 16, 28 | "the at least one SMS message comprises a compressed SMS message." | No. | *Elec. Power Grp.*, 830 F.3d at 1355. | No. |
| 7, 17, 29 | "the compressed SMS message comprises a WBXML (Wireless Application Protocol Binary Extensible Markup Language) encoded message." | No. | Same. | No. |
| 10, 20, 32 | "the data message comprises one of a calendar, a to-do list, personal information, and contact information." | No. | Same. | No. |

Each of the data formatting steps simply specify how the abstract process of reformatting information may be carried out. These additional abstract elements are not tied to any sort of physical structure (let alone a non-generic one). '505 Patent, 3:49-52 ("[s]ince modern-day mobile terminals already include SMS capability and since SMS centers are already in place and operating, **no new technology or equipment is needed** to send SyncML messages via the SMS network."), *see also* Ex. A, ¶¶ 33-36. Therefore, claims 2-13, 15-22, 24-35, 37-40, and 42-45 are abstract and do not add anything significantly more than the abstract idea of gathering, reformatting, and sending information.

Finally, the Federal Circuit has held that "merely selecting information, by content or source, for collection, analysis, and display does nothing significant to differentiate a process from ordinary mental processes." *Elec. Power Grp.*, 830 F.3d at 1355. Thus, the "compressed SMS message" of claims 6, 16, and 28, "WBXML (Wireless Application Protocol Binary Extensible Markup Language) encoded message" of claims 7, 17, and 29, and "calendar, a to-do list, personal

information, and contact information" of claims 10, 20, 32 merely amount to selecting information by source—limiting the information to a type of message. Therefore, the limitations also "[do] nothing significant to differentiate a process from ordinary mental processes." *See id.* Therefore, these are abstract and do not add anything significantly more than the abstract idea of data reformatting.

## V.    CONCLUSION

The independent claims of the '505 patent are directed to the abstract idea of gathering, reformatting, and sending information. The dependent claims either merely limit these abstract steps without adding an inventive concept or add routine and known components for carrying out the abstract steps. Indeed, ***every*** step of the claimed methods and functions can be performed in the mind of a human being. Therefore, the '505 patent is directed towards an abstract idea and ZTE requests summary judgment of invalidity under § 101.

DATED:  November 18, 2022                Respectfully submitted,


/s/Lionel M. Lavenue
Lionel M. Lavenue
Virginia Bar No. 49,005
lionel.lavenue@finnegan.com
**FINNEGAN, HENDERSON, FARABOW,**
**GARRETT & DUNNER, LLP**
1875 Explorer Street, Suite 800
Reston, VA 20190
  Phone:  (571) 203-2700
  Fax:     (202) 408-4400

  Attorney for Defendant,
  ZTE Corporation

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on November 18, 2022.

*/s/Lionel M. Lavenue*
Lionel M. Lavenue
